# EXHIBIT A

SU2025CV001667

GEORGIA, MUSCOGEE COUNTY
SUPERIOR/STATE COURT
eFILED
7/25/2025 4:26 PM
DANIELLE F. FORTE, CLERK

# IN THE SUPERIOR COURT OF <u>MUSCOGEE</u> COUNTY

## STATE OF GEORGIA

James Jackson, et al.
<u>Plaintiff(s)</u>

VS                                              CIVIL ACTION NO. _____ SU2025CV001667
3M Company (f/k/a Minnesota
<u>Mining</u> and Manufacturing, Co.), et al.
<u>Defendant(s)</u>

## <u>SUMMONS</u>

TO:  Chemguard, Inc.

     You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

       Steven T. Baron
       3102 Oak Lawn Ave., Ste. 1100
       Dallas, TX 75219

an answer to the complaint which is hereby served on you. You must make your answer within 30 days after service of this summons upon you.  This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

     If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

     This  __0 7 /2 5 /2 5__

                         **DANIELLE F. FORTE'**
                        CLERK OF SUPERIOR COURT
              BY_____/s/ Audra Kuresa_____
                        CLERK/DEPUTY CLERK

[Attach addendum sheet for additional parties, if needed. You must make a notation of this sheet if used.]

SC-1
Rev'd 1/25

SU2025CV001667

**General Civil and Domestic Relations Case Filing Information Form**

GEORGIA MUSCOGEE COUNTY
SUPERIOR STATE COURT
e-FILED
7/25/2025 4:26 PM
DANIELLE F FORTE, CLERK

☒ **Superior** or ☐ **State Court of** _____ Muscogee _____ **County**

| For Clerk Use Only | | |
|---|---|---|
| **Date Filed** _07/25/25_ | **Case Number** | SU2025CV001667 |
| **MM-DD-YYYY** | | |

| **Plaintiff(s)** | | | | | **Defendant(s)** | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jackson, James, et al. | | | | | 3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), et al. | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** _Steven T. Baron_    **State Bar Number** _106843_    **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ **Automobile Tort**
- ☐ **Civil Appeal**
- ☐ **Contempt/Modification/Other Post-Judgment**
- ☐ **Contract**
- ☐ **Garnishment**
- ☐ **General Tort**
- ☐ **Habeas Corpus**
- ☐ **Injunction/Mandamus/Other Writ**
- ☐ **Landlord/Tenant**
- ☐ **Medical Malpractice Tort**
- ☒ **Product Liability Tort**
- ☐ **Real Property**
- ☐ **Restraining Petition**
- ☐ **Other General Civil**

**Domestic Relations Cases**
- ☐ **Adoption**
- ☐ **Contempt**
  - ☐ **Non-payment of child support, medical support, or alimony**
- ☐ **Dissolution/Divorce/Separate Maintenance/Alimony**
- ☐ **Family Violence Petition**
- ☐ **Modification**
  - ☐ **Custody/Parenting Time/Visitation**
- ☐ **Paternity/Legitimation**
- ☐ **Support – IV-D**
- ☐ **Support – Private (non-IV-D)**
- ☐ **Other Domestic Relations**

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
**Case Number**                  **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

SU2025CV001667

GEORGIA MUSCOGEE COUNTY
SUPERIOR STATE COURT
eFILED
7/25/2025 4:26 PM
DANIELLE F FORTE, CLERK

## IN THE SUPERIOR COURT OF MUSCOGEE COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| JAMES JACKSON, HURLEY BOYD, KELLEY BOYLE, ANTHONY BROWN, JOHN BUFFINGTON, HOWARD BUSBY, JR., RUSSELL CABE, BOBBY CAMP, JASON CRUZ, HEATH DEFOOR, RICHARD DIEHL, ZACHARIAH DICKESON, JOHN DIXON, DONLEY EVANS, RICKY GAITHER, JR., DANIEL GILLMAN, TYLER HENDRIX, JEFFERY JORDAN, SAMUEL MANLEY, RANDALL MITCHELL, JAMES PICKETT, WANDA PYNES, RICHARD SCHAWO, HAKEEM SMITH, NORMAN SUTTLES, TERRY THOMPSON, HAROLD VARN, LUCA VILLALBA, TODD WALKER, TOMMY WEAVER, MOREY WILSON, JR., AND RICKY YOUNG, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| **Plaintiffs,** | ) ) |
| vs. | ) ) |
| | ) |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); AGC CHEMICALS AMERICAS, INC.; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT CO.; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CLARIANT CORPORATION; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; TYCO FIRE PRODUCTS, LP; AND JOHN DOE DEFENDANTS 1-49, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| **Defendants.** | ) ) ) ) |

CIVIL ACTION NO. SU2025CV001667 _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs, James Jackson, Hurley Boyd, Kelley Boyle, Anthony Brown, John Buffington, Howard Busby, Russell Cabe, Bobby Camp, Jason Cruz, Heath Defoor, Zachariah Dickeson, Richard Diehl, John Dixon, Donley Evans, Ricky Gaither, Jr., Daniel Gillman, Tyler Hendrix, Jeffery Jordan, Samuel Manley, Randall Mitchell, James Pickett, Wanda Pynes, Richard Schawo, Hakeem Smith, Norman Suttles, Terry Thompson, Harold Varn, Luca Villalba, Todd Walker, Tommy Weaver, Morey Wilson, Jr., and Ricky Young, by and through undersigned counsel, bring this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Archroma U.S., Inc., Arkema Inc., BASF Corporation, Buckeye Fire Equipment Company, Chemdesign Products, Inc., Chemguard, Inc., Clariant Corporation, Corteva, Inc., DuPont De Nemours, Inc., Dynax Corporation, E. I. Du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, and Tyco Fire Products, LP (individually and as successor-in-interest to The Ansul Company), and John Doe Defendants 1-49. Plaintiffs hereby allege, upon information and belief, as follows:

### I.    SUMMARY OF THE CASE

1.    Plaintiffs bring this action against Defendants who manufactured aqueous film-forming foam ("AFFF"), exposure to which resulted in Plaintiffs' serious personal injuries. The AFFF manufactured by Defendants contained per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS").

2.    PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

3.     PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain. PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

4.     At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluourinated chemicals contained in AFFF.

5.     This Complaint refers to AFFF, PFOA, PFOS, PFAS compounds, and fluorosurfactants collectively as "Fluorosurfactant Products."

6.     Defendants manufactured, marketed and/or sold Fluorosurfactant Products with the knowledge that firefighters would be exposed to these toxic compounds during fire protection, training, and response activities even when the AFFF was used as directed and intended by the manufacturer.

7.     Due to the widespread PFAS contamination caused by Defendants' Fluorosurfactant Products, including the contamination of Plaintiffs' drinking water supplies, Plaintiffs have suffered serious personal injuries set forth in detail below. Plaintiffs' injuries are a direct result of their exposure to the PFAS contamination present in their drinking water supplies.

8.     Plaintiffs, as residents and those who visited, worked, or resided in the contaminated areas, have been unknowingly exposed for many years to dangerous PFAS levels.

9.     Plaintiffs' unwitting exposure to PFAS in their water supply as a result of Defendants' conduct set forth below is the direct and proximate cause of Plaintiffs' injuries.

10.     Plaintiffs file this lawsuit to recover compensatory and all other damages, including but not limited to past and future (1) expenses for care, treatment and hospitalization incident to their injuries; (2) compensation for physical pain and suffering;  (3) loss of income, wages, or earning capacity; (4) compensation for mental or emotional pain and anguish; (5) physical impairment; (6) loss of companionship and society;  (7) inconvenience; (8) loss of enjoyment of life; and (9) exemplary damages.

## II.     PARTIES

### A.  Plaintiffs

10.     Plaintiff James Jackson is a resident and citizen of Columbus, Georgia in Muscogee County. From approximately 1968 to 2025, Plaintiff James Jackson was regularly exposed to PFAS through drinking water at residences in Columbus, Georgia and Sierra Vista, Arizona. Plaintiff James Jackson was also exposed to PFAS through drinking water while living and working at Marine Corps Base Camp Pendleton in California and Fort Benning (now Fort Moore) in Georgia.

11.     On or about December 2023, Plaintiff James Jackson was diagnosed with kidney cancer in Columbus, Georgia and subsequently underwent a radical right nephrectomy.

12.     Plaintiff Hurley Boyd is a citizen and resident of Ranburne, Alabama. From approximately 1991 to 2010, Plaintiff Hurley Boyd was regularly exposed to PFAS through drinking water at residences in Middletown, Ohio; Woodstock, Rome, and Bremen, Georgia; and Chattanooga, Tennessee.

13.     On or about 2009, Plaintiff Hurley Boyd was diagnosed with kidney cancer in Carrollton, Georgia and subsequently underwent a radical nephrectomy.

14.     Plaintiff Kelley Boyle is a citizen and resident of Phenix City, Alabama. From approximately 1990 to 2025, Plaintiff Kelley Boyle was regularly exposed to PFAS through drinking water at residences and workplaces in Columbus, Georgia and Phenix City, Alabama.

15.     On or about June 2020, Plaintiff Kelley Boyle was diagnosed with kidney cancer in Newnan, Georgia and subsequently underwent a radical left nephrectomy. On or about February 2025, Plaintiff Kelley Boyle was diagnosed with thyroid disease in Newnan, Georgia.

16.     Plaintiff Anthony Brown is a citizen and resident of Fayetteville, North Carolina. From approximately 1993 to 2024, Plaintiff Anthony Brown was regularly exposed to PFAS through drinking water at residences in Fayetteville, North Carolina and while serving in the army and stationed at Fort Leavenworth, Kansas; Fort Bragg, North Carolina; Fort Gregg-Adams, Virginia; Fort Lewis, Washington; and Fort Stewart, Georgia.

17.     On or about October 2012, Plaintiff Anthony Brown was diagnosed with kidney cancer in Bethesda, Maryland and subsequently underwent a radical bilateral nephrectomy, chemotherapy, immunotherapy, and radiation treatment.

18.     Plaintiff John Buffington is a citizen and resident of White, Georgia. From approximately 1984 to 2025, Plaintiff John Buffington was regularly exposed to PFAS through drinking water at residences and workplaces in Jacksonville, Alabama and Woodstock, Savannah, and White, Georgia.

19.     On or about 2008, Plaintiff John Buffington was diagnosed with clear cell renal carcinoma in Cartersville, Georgia and subsequently underwent a radical right nephrectomy.

20.     Plaintiff Howard Busby, Jr. is a citizen and resident of Griffin, Georgia. From approximately 1965 to 1988, Plaintiff Howard Busby, Jr. was regularly exposed to PFAS through drinking water at residences and workplaces in Homewood, Alabama; Citronelle, Alabama; Satsuma, Alabama; and Cataula, Georgia. Plaintiff Howard Busby, Jr. was also exposed to PFAS through drinking water while serving in the army and stationed at Fort Campbell in Oak Grove, Kentucky and Fort Sill in Lawton, Oklahoma.

21.     On or about July 2024, Plaintiff Howard Busby, Jr. was diagnosed with renal cell carcinoma in Thomaston, Georgia and subsequently underwent a left radical nephrectomy. On or about July 2024, Plaintiff Howard Busby, Jr. was also diagnosed with ulcerative colitis in Griffin, Georgia.

22.     Plaintiff Russell Cabe is a citizen and resident of Rome, Georgia. From approximately 1963 to 2025, Plaintiff Russell Cabe was regularly exposed to PFAS through drinking water at residences and workplaces in Rome and Cave Spring, Georgia.

23.     On or about March 2007, Plaintiff Russell Cabe was diagnosed with testicular cancer in Rome, Georgia and subsequently underwent a left orchiectomy and radiation treatment.

24.     Plaintiff Bobby Camp is a citizen and resident of Griffin, Georgia. From approximately 1972 to 2025, Plaintiff Bobby Camp was regularly exposed to PFAS through drinking water at residences in Griffin, Georgia. Plaintiff was also exposed to PFAS through drinking water while serving in the army and stationed at Fort Jackson in Columbia, South Carolina and Fort Cavazos in Killeen, Texas.

25.     On or about 2005, Plaintiff Bobby Camp was diagnosed with kidney cancer in Griffin, Georgia and subsequently underwent a right radical nephrectomy.

26.     Plaintiff Jason Cruz is a citizen and resident of Cumming, Georgia. From approximately 1998 to 2025, Plaintiff Jason Cruz was regularly exposed to PFAS through drinking water at residences and schools in Miramar and Pembroke Pines, Florida and Cumming, Georgia.

27.     On or about October 2018, Plaintiff Jason Cruz was diagnosed with testicular cancer in Johns Creek, Georgia and subsequently underwent a total left orchiectomy.

28.    Plaintiff Heath Defoor is a citizen and resident of Chatsworth, Georgia. From approximately 1991 to 2025, Plaintiff Heath Defoor was regularly exposed to PFAS through drinking water at residences in Resaca and Dalton, Georgia.

29.    On or about April 2023, Plaintiff Heath Defoor was diagnosed with kidney cancer in Chattanooga, Tennessee and subsequently underwent a left radical nephrectomy and immunotherapy.

30.    Plaintiff Richard Diehl is a citizen and resident of Augusta, Georgia. From approximately 1997 to 2025, Plaintiff Richard Diehl was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Gordon, Georgia; Augusta, Georgia; Hephzibah, Georgia; Aiken, South Carolina; and Okeechobee, Florida. Plaintiff Richard Diel was also exposed to PFAS through his use of AFFF from approximately 1970 to 1977 while employed as a firefighter in Bolivar, Ohio.

31.    On or about 2007, Plaintiff Richard Diehl was diagnosed with testicular cancer in Augusta, Georgia and subsequently underwent a right orchiectomy and immunotherapy treatment.

32.    Plaintiff Zachariah Dickeson is a citizen and resident of Hollywood, Florida. From approximately 2009 to 2025, Plaintiff Zachariah Dickeson was regularly exposed to PFAS through drinking water at residences in Dalton, Georgia and Hollywood, Florida.

33.    On or about February 2021, Plaintiff Zachariah Dickeson was diagnosed with testicular cancer in Fort Lauderdale, Florida and subsequently underwent a right orchiectomy.

34.    Plaintiff John Dixon is a citizen and resident of Forsyth, Georgia. From approximately 1997 to 2014, Plaintiff John Dixon was regularly exposed to PFAS through drinking water at residences in Macon and Forsyth, Georgia.

35.    On or about November 2014, Plaintiff John Dixon was diagnosed with testicular cancer in Macon, Georgia and subsequently underwent a left orchiectomy and chemotherapy.

36.    Plaintiff Donley Evans is a citizen and resident of McDonough, Georgia. From approximately 1974 to 2025, Plaintiff Donley Evans was regularly exposed to PFAS through drinking water at residences and workplaces in McDonough, Georgia. Plaintiff Donley Evans was also exposed to PFAS through drinking water while serving in the army and stationed at Fort Jackson in Columbia, South Carolina.

37.    On or about May 2020, Plaintiff Donley Evans was diagnosed with renal cell carcinoma in Stockbridge, Georgia and subsequently underwent a right radical nephrectomy.

38.    Plaintiff Ricky Gaither, Jr. is a citizen and resident of Richland, Georgia. From approximately 1996 to 2016, Plaintiff Ricky Gaither, Jr. was regularly exposed to PFAS through drinking water at residences in Columbus, Georgia and Phenix City, Alabama.

39.    On or about November 2020, Plaintiff Ricky Gaither, Jr. was diagnosed with testicular cancer in Columbus, Georgia and subsequently underwent a left orchiectomy.

40.    Plaintiff Daniel Gillman is a citizen and resident of Millen, Georgia. From approximately 1979 to 2020, Plaintiff Daniel Gillman was regularly exposed to PFAS through drinking water at residences in Greensboro, North Carolina; Milton-Freewater, Oregon; Dallas, Texas; and Augusta, Georgia. Plaintiff Daniel Gillman was also exposed to PFAS through drinking water while serving in the navy and stationed at Naval Base San Diego in San Diego, California; NAWCAD Lakehurst in Lakehurst, New Jersey; and Naval Station Norfolk in Norfolk, Virginia.

41.    On or about January 2016, Plaintiff Daniel Gillman was diagnosed with kidney cancer in Shreveport, Louisiana and subsequently underwent a partial left nephrectomy.

42.    Plaintiff Tyler Hendrix is a citizen and resident of Ringgold, Georgia. From approximately 1992 to 2025, Plaintiff Tyler Hendrix was regularly exposed to PFAS through drinking water at residences and workplaces in Ringgold and Dalton, Georgia and Chattanooga, Tennessee.

43.    On or about June 2022, Plaintiff Tyler Hendrix was diagnosed with testicular cancer in Chattanooga, Tennessee and subsequently underwent a left orchiectomy and chemotherapy.

44.    Plaintiff Jeffery Jordan is a citizen and resident of Rincon, Georgia. From approximately 2013 to 2021, Plaintiff Jeffery Jordan was regularly exposed to PFAS through drinking water at residences in Canton and Savannah, Georgia and Anniston and Oxford, Alabama.

45.    On or about March 2021, Plaintiff Jeffery Jordan was diagnosed with testicular cancer in Savannah, Georgia and subsequently underwent a right orchiectomy.

46.    Plaintiff Samuel Manley is a citizen and resident of Chatsworth, Georgia. From approximately 1962 to 2025, Plaintiff Samuel Manley was regularly exposed to PFAS through drinking water at multiple residences in Chatsworth, Georgia. From approximately 1977 to 1980, Plaintiff Samuel Manley was also exposed to PFAS through drinking water while serving in the Army and stationed at Fort Riley in Fort Riley, Kansas, and Fort Leonard Wood in Fort Leonard Wood, Missouri.

47.    On or about 2012, Plaintiff Samuel Manley was diagnosed with kidney cancer in Atlanta, Georgia, and subsequently underwent a partial right nephrectomy.

48.    Plaintiff Randall Mitchell is a citizen and resident of Hereford, Arizona. From approximately 1970 to 2009, Plaintiff Randall Mitchell was regularly exposed to PFAS through drinking water at residences and workplaces in Orlando, Florida; Kissimmee, Florida; and Valdosta, Georgia.

49.    On or about 2016, Plaintiff Randall Mitchell was diagnosed with testicular cancer in Valdosta, Georgia and subsequently underwent a right orchiectomy and radiation treatment.

50.    Plaintiff James Pickett is a citizen and resident of Rising Fawn, Georgia. From approximately 2004 to 2020, Plaintiff James Pickett was regularly exposed to PFAS through drinking

water at residences and workplaces in LaFayette, Rock Spring, Chickamauga, Rocky Face, and Ringgold, Georgia.

51.    On or about July 2006, Plaintiff James Pickett was diagnosed with testicular cancer in Chattanooga, Tennessee, and subsequently underwent a right orchiectomy and chemotherapy.

52.    Plaintiff Wanda Pynes is a citizen and resident of Statham, Georgia. From approximately 1989 to 1998, Plaintiff Wanda Pynes was regularly exposed to PFAS through drinking water at a residence in Forest Park, Georgia. From approximately 1989 to 1995, Plaintiff Wanda Pynes was also exposed to PFAS through drinking water while working at Fort McPherson in Atlanta, Georgia, and Fort Gillem in Forest Park, Georgia.

53.    On or about 2015, Plaintiff Wanda Pynes was diagnosed with kidney cancer in Snellville, Georgia, and subsequently underwent a left radical nephrectomy.

54.    Plaintiff Richard Schawo is a citizen and resident of Warner Robins, Georgia. From approximately 1968 to 2017, Plaintiff Richard Schawo was regularly exposed to PFAS through drinking water while serving in the Air Force and stationed at Robins Air Force Base in Wardner Robins, Georgia, Mountain Home Air Force Base in Mountain Home Air Force Base, Idaho, George Air Force Base (decommissioned) in Victorville, California, and Chanute Air Force Base (decommissioned) in Rantoul, Illinois.

55.    On or about March 2025, Plaintiff Richard Schawo was diagnosed with kidney cancer in Macon, Georgia, and is currently undergoing continued treatment.

56.    Plaintiff Hakeem Smith is a citizen and resident of Tampa, Florida. From approximately 2007 to 2025, Plaintiff Hakeem Smith was regularly exposed to PFAS through drinking water at residences in Savannah, Georgia, and Tampa, Florida.

57. On or about August 2020, Plaintiff Hakeem Smith was diagnosed with testicular cancer in Jacksonville, Florida and subsequently underwent a left orchiectomy, chemotherapy, and radiation therapy.

58. Plaintiff Norman Suttles is a citizen and resident of Cumming, Georgia. From approximately 1991 to 2025, Plaintiff Norman Suttles was regularly exposed to PFAS through drinking water at residences in Cumming, Georgia and Salt Lake City, Utah.

59. On or about September 2014, Plaintiff Norman Suttles was diagnosed with testicular cancer in Marietta, Georgia and subsequently underwent a bilateral orchiectomy and radiation therapy. On or about 2024, Plaintiff Norman Suttles was again diagnosed with testicular cancer in Marietta, Georgia and subsequently underwent radiation therapy.

60. Plaintiff Terry Thompson is a citizen and resident of Bonaire, Georgia. From approximately 1960 to 2001, Plaintiff Terry Thompson was regularly exposed to PFAS through drinking water at multiple residences in Warner Robins, Georgia. From approximately 1969 to 1973, Plaintiff Terry Thompson was also exposed to PFAS through drinking water while serving in the Air Force and stationed at Eglin Air Force Base in Valparaiso, Florida, Keesler Air Force Base in Biloxi, Mississippi, and Lackland Air Force Base (now Joint Base San Antonio-Lackland) in San Antonio, Texas.

61. On or about June 2017, Plaintiff Terry Thompson was diagnosed with clear cell renal carcinoma in Warner Robins, Georgia and subsequently underwent a left cryoablation.

62. Plaintiff Harold Varn is a citizen and resident of Buford, Georgia. From approximately 1992 to 1998, Plaintiff Harold Varn was regularly exposed to PFAS through drinking water at multiple residences in Woodstock, Georgia.

63. On or about August 2011, Plaintiff Harold Varn was diagnosed with testicular cancer in Lawrenceville, Georgia, and subsequently underwent a right orchiectomy and radiation therapy.

64.     Plaintiff Luca Villalba is a citizen and resident of Lakewood, Washington. From approximately 2005 to 2025, Plaintiff Luca Villalba was regularly exposed to PFAS through drinking water at residences in Cumming, Georgia and Lakewood, Washington.

65.     On or about November 2023, Plaintiff Luca Villalba was diagnosed with testicular cancer in Sarasota, Florida and subsequently underwent a right orchiectomy.

66.     Plaintiff Todd Walker is a citizen and resident of Detroit, Michigan. From approximately 1982 to 1983, Plaintiff Todd Walker was regularly exposed to PFAS through drinking water while serving in the National Guard and stationed at Fort Benning in Columbus, Georgia and Fort Jackson in Columbia, South Carolina.

67.     On or about 2008, Plaintiff Todd Walker was diagnosed with kidney cancer in Detroit, Michigan, and subsequently underwent a right radical nephrectomy.

68.     Plaintiff Tommy Weaver is a citizen and resident of Ellijay, Georgia. From approximately 1990 to 2023, Plaintiff Tommy Weaver was regularly exposed to PFAS through drinking water a residences and workplaces in Rome, Chatsworth, Woodstock, and Canton, Georgia.

69.     On or about September 2021, Plaintiff Tommy Weaver was diagnosed with kidney cancer in Calhoun, Georgia, and subsequently underwent a right radical nephrectomy.

70.     Plaintiff Morey Wilson, Jr. is a citizen and resident of Columbus, Georgia in Muscogee County. From approximately 1980 to 2025, Plaintiff Morey Wilson, Jr. was regularly exposed to PFAS through drinking water at residences in Columbus, Georgia and Birmingham, Alabama.

71.     On or about April 2023, Plaintiff Morey Wilson, Jr. was diagnosed with kidney cancer in Columbus, Georgia and subsequently underwent a left radical nephrectomy.

72.     Plaintiff Ricky Young is a citizen and resident of Sparta, Georgia. From approximately 1989 to 2011, Plaintiff Ricky Young was regularly exposed to PFAS through drinking

water at multiple residences in Augusta, Georgia. From approximately 1984 to 1986, Plaintiff Ricky Young was also exposed to PFAS through drinking water while serving in the Marine Corps and stationed at Camp Pendleton North in Oceanside, California and Twentynine Palms Marine Corp Base in Twentynine Palms, California.

73.     On or about December 2017, Plaintiff Ricky Young was diagnosed with renal cell carcinoma in Augusta, Georgia and subsequently underwent a right radical nephrectomy.

**B.  Defendants**

74.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products to which Plaintiffs were exposed.

75.     **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

76.     3M is the only company that manufactured and/or sold AFFF containing PFOS.

77.     **AGC AMERICA:** Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

78.     **AGC:** Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

79.    **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

80.    **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

81.    **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

82.    **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

83.    **CHEMDESIGN:** Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

84.    **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

85.    **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

86.     **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

87.     **DUPONT DE NEMOURS:** Defendant DuPont De Nemours, Inc. (f/k/a DowDuPont, Inc.) is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont.

88.     Upon information and belief, Corteva was originally formed in February 2018 as a wholly-owned subsidiary of DowDuPont, Inc. On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Corteva. In doing so, DowDuPont, Inc. distributed all issued and outstanding shares of Corteva common stock to DowDuPont, Inc. stockholders by way of a pro-rata dividend. Upon information and belief, following that distribution, Corteva became the direct parent of DuPont, and holds certain DowDuPont, Inc. assets and liabilities.

89.     Following the June 1, 2019 spin-off of Corteva and of another entity, Dow, Inc., DowDuPont, Inc. changed its name to DuPont De Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont retained assets in the specialty products business lines, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

90.     **DYNAX:** Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

91.     **DUPONT:** Defendant E. I. Du Pont De Nemours and Company ("DuPont") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

92.    **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

93.    In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

94.    **CHEMOURS FC:** Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company that conducts business throughout the United States. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

95.    **TYCO:** Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

96.    Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange.

97.    Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

98.    Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the Plaintiffs will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

99.    All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the State of Georgia.

100.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

101.    The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### III.    JURISDICTION & VENUE

102.    This Court has jurisdiction pursuant to GA Code § 9-10-91 (2024) because the Defendants have transacted business within the State of Georgia at all times relevant to this complaint.

103.    Venue for this action properly lies in the County of Muscogee pursuant to GA Code § 9-10-93 (2024) because a substantial part of the Defendants' business was transacted in Muscogee

County, and tortious acts, omissions, and injuries set forth in this complaint occurred in Muscogee County.

## IV.    FACTUAL ALLEGATIONS

### A. The PFAS Contaminants at Issue: PFOA and PFOS

104.    Both PFOA and PFOS fall within a class of chemical compounds known as perfluoroalkyl acids ("PFAAs"). PFAAs are then part of a larger chemical family recognized as per- and polyfluoroalkyl substances ("PFAS"). PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, meanwhile the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature.

105.    PFAAs are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

106.    PFOA and PFOS are stable, man-made chemicals.  They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

107.    Both PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[1]

---

[1] EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document No. EPA 822-R-16-002 (May 2016), available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed March 11, 2025);  EPA, *Health Effects Support Document for Perfluorooctanoic Acid (PFOA)*, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed March 11, 2025).

108.    Moreover, PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[2]

109.    Notably, from the time these two compounds were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS. According to EPA, PFOA and PFOS are associated with high cholesterol, thyroid disorders, pregnancy-induced hypertension, preeclampsia, reproductive, developmental, and systemic effects, and cancers.[3]

110.    The EPA has warned that there is suggestive evidence of the carcinogenic potential for PFOA and PFOS in humans.[4]

111.    Additionally, the EPA has noted that drinking water can be an additional source of PFOA and PFOS in the body.[5]

112.    The EPA continues to research the effects of PFAS.  In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt). The EPA therefore

---

[2] See notes 1, 2, supra.  See also EPA, Technical Fact Sheet – Perflurooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), available at  https://www.regulations.gov/document/EPA-HQ-TRI-2022-0270-0009 (last accessed March 11, 2025).

[3] Id.

[4] See EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed March 11, 2025).

[5] EPA, Technical Fact Sheet – Perflurooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), available at https://www.regulations.gov/document/EPA-HQ-TRI-2022-0270-0009 (last accessed March 11, 2025).

announced new Interim Updated Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.[6]

113.    In April, 2024, the EPA established legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water: PFOA, PFOS, PFHxS, PFNA, and HFPO-DA as contaminants with individual MCLs, and PFAS mixtures containing at least two or more of PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index MCL to account for the combined and co-occurring levels of these PFAS in drinking water. EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for these PFAS. The MCLs for PFOA and PFOS are each 4 parts per trillion ("ppt").[7]

**B.   Aqueous Film-Forming Foam (AFFF) Contained PFOS and/or PFOA at Relevant Times**

114.    Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

115.    Generally, AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

116.    The AFFF products made by Defendants during the relevant time period contained either or both PFOA and PFOS. AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS. All other Defendants used telomerization to produce AFFF. Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

---

[6] EPA, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)*, Document Number 822-F-22-002, available at https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P10154ST.txt (last accessed March 11, 2025).

[7] EPA, Per- and *Polyfluoroalkyl Substances (PFAS), Final PFAS National Primary Drinking Water Regulation*, available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last accessed March 11 2025).

117.    When used as the Defendants intended and directed, AFFF causes PFOA, PFOS, and/or other PFAS compounds to enter the body of those handling, using, or otherwise exposed to the foam (including firefighters).  When using AFFF, firefighters may absorb PFOA and PFOS through their skin, inhale PFOA and PFOS compounds, or inadvertently ingest PFOA and PFOS compounds.

118.    Additionally, when used as the Defendants intended and directed, AFFF causes PFOA and PFOS to seep into groundwater, and thus, drinking water supplies in the areas in which it is used. Once in the water supply, PFOA and PFOS can travel long distances from where the AFFF was used. This has resulted in widespread contamination of drinking water supplies with PFOA and PFOS nationwide.

119.    Notably, AFFF can be made without PFOA and PFOS.  Unlike AFFF made with PFOA or PFOS, fluorine-free foams do not pose a significant health risk to individuals.

120.    Despite having knowledge of this fact—as well as having knowledge regarding the toxic nature of AFFF made with PFOA and/or PFOS—Defendants continued to manufacture, distribute and/or sell AFFF with PFOA and/or PFOS, which has ultimately led to Plaintiffs' injuries.

**C. Defendants' Knowledge of PFOA and PFOS Hazards**

121.    On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) when AFFF is used per the instructions given by the manufacturer, PFOA and PFOS migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

122.    At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal

tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

123.    For instance, in 1980, 3M published data in peer reviewed literature showing that humans retain PFOA in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOA from their body after all exposures had ceased.[8]

124.    By the early 1980s, the industry suspected a correlation between PFOA exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOA in workers' bodies and birth defects in children of workers.

125.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[9]

126.    Beginning in 1983, 3M documented a trend of increasing levels of PFOA in the bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[10]

---

[8] *See* Ubel, F.A., Sorenson, S.D., and Roach, D.E., *Health status of plant workers exposed to fluorochemicals - a preliminary report.* Journal Am. Ind Hyg. Assoc. J 41:584-89 (1980).

[9] *See* DuPont, *C-8 Blood Sampling Results*, available at https://static.ewg.org/files/PFOA_013.pdf?_gl=1*anldwl*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21GC4 9KT*MTY4MzU4Nzg2OC4yLjEuMTY4MzU4Nzk0MC4wLjAuMA..&_ga=2.26293428.885409355.1683587869-581783177.1682689989 (last accessed March 11, 2025).

[10] *See* 3M, Internal Memorandum, *Organic Fluorine Levels*, (August 31, 1984), Office of Minnesota Attorney General, Exhibit List, No. 1313, available at https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp (last accessed March 11, 2025).

127.    Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.    The company stopped producing PFOA at approximately the same time.

128.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks such as Forafac 1157 N, for use in the manufacturing of AFFF products.

129.    On information and belief, by no later than 2001 Old DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and harmed Plaintiffs.

130.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[11]

131.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont $16,500,000 for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[12]

---

[11] EPA, Consent Agreement and Final Order, *In re E.I. DuPont de Nemours & Co.*, TSCA Docket TSCA-HQ-2004-0016 (Dec. 14, 2005), available at https://www.epa.gov/sites/default/files/documents/dupontpfoasettlement121405.pdf (last accessed March 11, 2025).

[12] *Id.*

132.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[13] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[14] By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

133.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

134.    Defendants also knew or should have known that: (a) users of AFFF would likely include fire and rescue training organizations and their personnel; (b) fire and rescue personnel were foreseeable users of AFFF containing or degrading into PFOA and/or PFOS in both training and real-life fire emergency scenarios; (c) PFOA and PFOS are dangerous to human health when used by fire and rescue personnel; (d) fire and rescue personnel foreseeably lacked knowledge of these dangers; and, (e) fire and rescue personnel would require warnings of these dangers and/or affirmative instructions in the use of AFFF.

---

[13] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease. *See* C8 Panel, *C8 Probable Link Reports*, available at http://www.c8sciencepanel.org/prob_link.html (last accessed March 11, 2025).

[14] *See* C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), available at http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last accessed March 11, 2025).

135.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, purchased, supplied, and/or sold PFOA/PFOS; (2) issued instructions on how AFFF should be used and disposed of; (3) failed to recall and/or warn the users of AFFF of the dangers to human health that result from the standard use and disposal of these products; negligently designed products containing or degrading into PFOA and/or PFOS; and (5) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFOA/PFOS.

136.    Further, Defendants failed to disclose to environmental regulators and the general public the likely existence of and health risks to the public caused by widespread PFOA and PFOS contamination in drinking water supplies across the country as a result of AFFF usage.

137.    As a direct result of Defendants' acts alleged in this Complaint, Plaintiffs suffered severe health effects caused by exposure to AFFF containing PFOA and/or PFOS. As a direct and proximate result, Plaintiffs incurred substantial harm, both economic and non-economic.

138.    Defendants had a duty and breached their duty to evaluate and test such products adequately and thoroughly to determine their potential human health impacts before they sold such products. They also had a duty and breached their duty to minimize the risk of harm to human health caused by PFOA and PFOS.

**D.    The Impact of PFOA and PFOS on the Plaintiffs**

139.    Plaintiffs have been significantly and continuously exposed to PFOA and PFOS over many years as a result of Defendants' conduct.

140.    Plaintiffs have been diagnosed with the serious injuries set forth above, including kidney cancer, testicular cancer, thyroid disease, and ulcerative colitis.

141.    Plaintiffs' injuries were caused by Defendants' Fluorosurfactant Products.

142. The use of Fluorosurfactant Products as directed and intended by the manufacturers caused Plaintiffs' exposure to PFOA and PFOS, which caused Plaintiffs' injuries.

143. Therefore, as a direct and proximate result of Defendants' tortious conduct as set forth in this complaint, Plaintiffs were damaged in the following ways:

     a.    Plaintiffs suffered physical pain and mental anguish;

     b.    Plaintiffs incurred hospital, medical, pharmaceutical and other expenses; and

     c.    Plaintiffs experienced undue stress related to their diagnoses, medical conditions, and uncertainty about their prognoses.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – DESIGN DEFECT

144. Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

145. Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and selling Fluorosurfactant Products.

146. Defendants manufactured, marketed and/or sold Fluorosurfactant Products, including AFFF products for use in firefighter training exercises and in controlling and extinguishing aviation, marine, fuel, and other flammable liquid fuel fires.

147. Plaintiffs were harmed by Fluorosurfactant Products which were designed, manufactured, formulated, marketed, sold and/or distributed by Defendants, or that Defendants assumed or acquired liabilities for, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

148. Upon information and belief, Defendants' Fluorosurfactant Products used on or in the vicinity of Plaintiffs' residences, schools, and workplaces were used in a reasonably foreseeable manner and without substantial change in the condition in which the Products were sold.

149.    Defendants knew, or should have known, that the intended use of Defendants' AFFF products would result in the release of PFOA and PFOS, among other PFAS compounds, into the ambient environment, allowing Plaintiffs' exposure to these chemicals.

150.    Furthermore, Defendants knew, or should have known, that their Fluorosurfactant Products were toxic and presented human health risks to users, handlers, and bystanders.

151.    Defendants' Fluorosurfactant Products used by Plaintiffs, or in the vicinity of Plaintiffs, were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

152.    Defendants' Fluorosurfactant Products used by or near Plaintiffs were defective in design and unreasonably dangerous because, among other things: (a) AFFF release PFOA and PFOS when used in their foreseeable and intended manner; (b) users and handlers of AFFF products would be exposed to PFOA and PFOS when using those products as intended and instructed; (c) PFOA and PFOS pose significant threats to human health; and (d) exposure to PFOA and PFOS causes serious medical conditions including cancers.

153.    Plaintiffs were, are, and will continue to be harmed by Defendants' defectively designed Fluorosurfactant Products.

154.    The design of Defendants' Fluorosurfactant Products was a substantial factor in causing harm to Plaintiffs.

155.    The gravity of the environmental harm resulting from Defendants' Fluorosurfactant Products was, is, and will be enormous because exposure to PFOA and PFOS causes serious medical conditions including cancers.

156.    The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that the intended use, handling, and storage of Defendants' AFFF products would release PFOA and PFOS.

157.    At the time of manufacture, there were safer alternative designs that were feasible, cost effective, and advantageous, including not using PFOS, PFOA and/or their precursor chemicals in products.

158.    Defendants conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others, and thus Defendants were grossly negligent.

159.    As a direct and proximate result of Defendants' tortious acts, Plaintiffs were damaged in the following ways:

    a.  Plaintiffs suffered physical pain and mental anguish;

    b.  Plaintiffs incurred hospital, medical, pharmaceutical, and other expenses; and

    c.  Plaintiffs experienced undue stress and fear related to their diagnoses, medical conditions, and uncertainty about their prognoses.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY- FAILURE TO WARN

160.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

161.    As manufacturers, distributors, suppliers, sellers, and marketers of Fluorosurfactant Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFOA and PFOS and by the release of PFOA and PFOS, and exposure to these compounds, inherent in the use of AFFF products.

162.    Defendants knew that their AFFF would be purchased, transported, stored, handled, and used without notice of the hazards that PFOA and PFOS pose to human health.

163.    Defendants breached their duty to warn by unreasonably failing to provide purchasers, consumers, users, handlers, and Plaintiffs with warnings about the health hazards associated with

exposure to PFOA and PFOS released during use of AFFF, despite Defendants' knowledge that PFOA and PFOS pose serious risks of harm including serious medical conditions such as cancer.

164.    Fluorosurfactant Products purchased or otherwise acquired from Defendants were used, discharged, and/or released by Plaintiffs and/or in the vicinity of Plaintiffs, exposing Plaintiffs to PFOA and/or PFOS.

165.    Defendants' Fluorosurfactant Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

166.    Defendants' Fluorosurfactant Products used by and/or in the vicinity of Plaintiffs were defective in design and unreasonably dangerous for the reasons set forth above.

167.    Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' Fluorosurfactant Products and human exposure to PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

168.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their AFFF products.

169.    Plaintiffs were, are, and will continue to be harmed by Defendants' Fluorosurfactant Products.

170.    Defendants' failure to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their Fluorosurfactant Products was a substantial factor in causing harm to Plaintiffs.

171.    As a direct and proximate result of Defendants' tortious acts, Plaintiffs were damaged in the following ways:

      a.    Plaintiffs suffered physical pain and mental anguish;

      b.    Plaintiffs incurred hospital, medical, pharmaceutical, and other expenses; and

c. Plaintiffs experienced undue stress and fear related to their diagnoses, medical conditions, and uncertainty about their prognoses.

## THIRD CAUSE OF ACTION
## NEGLIGENCE- FAILURE TO WARN

172. Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

173. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, and/or as those who assumed or acquired liabilities for the manufacture and sale of Fluorosurfactant Products, Defendants owed a duty of care to Plaintiffs not to place into the stream of commerce a defective product that was in a defective condition and unreasonable dangerous to purchasers, end users, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, such as Plaintiffs.

174. Despite the fact that Defendants knew that PFOA and PFOS are toxic and present significant risks to human health, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting Plaintiffs' exposure to PFOA and/or PFOS; (c) failed to warn the users of Fluorosurfactant Products of the dangers of exposure to PFOA and/or PFOS as a result of standard use, handling, storage, and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products although Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

175. Plaintiffs were foreseeable victims of the harm caused by Defendants' Fluorosurfactant Products.

176.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the Fluorosurfactant Products.

177.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

178.    Plaintiffs were, are, and will continue to be harmed as a result of Defendants' above described acts and omissions.

179.    Defendants' failure to warn was a substantial factor in causing Plaintiffs' harm.

180.    As a direct and proximate result of Defendants' tortious acts, Plaintiffs were damaged in the following ways:

    a.   Plaintiffs suffered physical pain and mental anguish;

    b.   Plaintiffs incurred hospital, medical, pharmaceutical, and other expenses; and

    c.   Plaintiffs experienced undue stress and fear related to their diagnoses, medical conditions, and uncertainty about their prognoses.

## FOURTH CAUSE OF ACTION
### NEGLIGENCE – FAILURE TO RECALL

181.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

182.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, and/or as those who assumed or acquired liabilities for the manufacture and sale of Fluorosurfactant Products, Defendants owed a duty to Plaintiffs, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

183.    Defendants' Fluorosurfactant Products were designed, manufactured, marketed, distributed and sold without adequate warning of toxicity and potential human health risks associated with the use of these products --- including AFFF.

184.    Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with their Fluorosurfactant Products.

185.    Defendants knew or reasonably should have known that their Fluorosurfactant Products were dangerous or likely to be dangerous when used, handled, stored, or misused in a reasonably foreseeable manner.

186.    Defendants knew or reasonably should have known that users and third parties would not realize the dangers of exposure to PFOA and/or PFOS inherent in the intended use, handling, and storage of AFFF products.

187.    Defendants became aware of the human health risks presented by their Fluorosurfactant Products by no later than the year 2000.

188.    Despite the fact that Defendants became aware of the human health risks and environmental hazards presented by their Fluorosurfactant Products by no later than the year 2000, Defendants (a) failed to recall and/or warn the users of Fluorosurfactant Products of the human health dangers presented by standard use, handling, storage, and disposal of these products; and (b) failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identities of the purchasers of their Fluorosurfactant Products.

189.    Plaintiffs were foreseeable victims of the harm caused by Defendants' Fluorosurfactant Products.

190.    A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of Fluorosurfactant Products.

191.    Defendants' failure to recall their Fluorosurfactant Products was a substantial factor in causing Plaintiffs' harm.

192.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

193.    As a direct and proximate result of Defendants' tortious acts, Plaintiffs were damaged in the following ways:

    a.    Plaintiffs suffered physical pain and mental anguish;

    b.    Plaintiffs incurred hospital, medical, pharmaceutical, and other expenses; and

    c.    Plaintiffs experienced undue stress and fear related to their diagnoses, medical conditions, and uncertainty about their prognoses.

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE UNIFORM VOIDABLE TRANSACTIONS ACT
### (AGAINST UVTA DEFENDANTS ONLY)

194.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

195.    Plaintiffs seek equitable and other relief pursuant to the Uniform Voidable Transactions Act ("UVTA"), as adopted by the State of Georgia in O.C.G.A. § 18-2-70 (2022), et seq., against Old DuPont, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and New DuPont (collectively, the "UVTA Defendants").

196.    Pursuant to O.C.G.A. § 18-2-74(a) (2022), "[a] transfer made or an obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the

transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the

obligation:

  a.  With actual intent to hinder, delay, or defraud any creditor of the debtor; or

  b.  Without receiving a reasonably equivalent value in exchange for the transfer or

      obligation, and the debtor:

      i.   Was engaged or was about to engage in a business or a transaction for which

           the remaining assets of the debtor were unreasonably small in relation to the

           business or transaction; or

      ii.  Intended to incur, or believed or reasonably should have believed that [the

           debtor] would incur, debts beyond [the debtor's] ability to pay as they became

           due."

    197.   Further, O.C.G.A. § 18-2-74(b) (2022) states that, "[i]n determining actual intent

under paragraph (1) of subsection (a) of this Code section, consideration may be given, among other

factors, to whether: [...] before the transfer was made or obligation was incurred, the debtor had been

sued or threatened with suit; the transfer was of substantially all of the debtor's assets; [...] the value

of the consideration received by the debtor was reasonably equivalent to the value of the asset

transferred or the amount of the obligation incurred; [and] the transfer occurred shortly before or

shortly after a substantial debt was incurred."

    198.   Upon information and belief, in February 2014, Old DuPont formed The Chemours

Company as a wholly-owned subsidiary and used it to spin off Old DuPont's "Performance

Chemicals" business line in July 2015.

    199.   Upon information and belief, at the time of the spinoff, Old DuPont's Performance

Chemicals division contained the Fluorosurfactant Products business segments. In addition to the

transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS.

200.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

201.    The UVTA Defendants acted with actual intent to hinder, delay, and to defraud any creditor of the UVTA Defendants because: (1) they were engaged and or about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business and; (2) intended to incur, or believed or reasonably should have believed or reasonably should have believed that the Chemours Company would incur, debts beyond its ability to pay as they became due.

202.    The UVTA Defendants engaged in actions in furtherance of a scheme to transfer Old DuPont's assets out of the reach of Plaintiffs, and other similar parties, that have been damaged as a result of UVTA Defendants' conduct, omissions, and actions described herein.

203.    As a result of the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of Fluorosurfactant Products.

204.    Pursuant to O.C.G.A. § 18-2-70 (2022), et seq., Plaintiffs seek avoidance of the transfer of Old DuPont's liabilities for the claims brought in this Complaint and to hold the UVTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiffs in this action.

205.    Plaintiffs further seek all other rights and remedies that may be available to them under UVTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiffs for the damages and injuries they have suffered as alleged in this Complaint.

## TOLLING OF THE STATUTE OF LIMITATIONS

206.    Plaintiffs hereby incorporate by reference the allegations contained within the preceding paragraphs of this Complaint as if restated in full herein.

### Discovery Rule Tolling

207.    Plaintiffs did not know, nor could they have reasonably discovered by the exercise of reasonable diligence, that exposure to fluorochemical products, including AFFF, PFOA, and PFOS was harmful to human health. The risks of said chemicals and AFFF were not obvious to the users of AFFF, nor were they obvious to individuals such as Plaintiffs in the vicinity of AFFF use. Since Plaintiffs could not have reasonably discovered the defects and risks associated with the use of fluorochemical products, they could not protect themselves from exposure to Defendants' fluorochemical products. For this reason, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

208.    Plaintiffs had no way of knowing about the risk of serious injury associated with the use of, and exposure to, AFFF and fluorochemical products until very recently. Further, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF, PFOA, PFOS, and other fluorochemical products is harmful to human health until very recently.

209.    During the relevant times, Plaintiffs did not possess specialized scientific or medical knowledge. Plaintiffs did not, and could not, have discovered or known facts that could cause a reasonable person to suspect the risk associated with the use of Defendants' fluorochemical products.

Further, a reasonable and diligent investigation by Plaintiffs earlier would not have disclosed that AFFF could cause personal injury.

210.    Wherefore, all applicable statutes of limitations pertaining to Plaintiffs' claims have been tolled by operation of the discovery rule.

## Fraudulent Concealment

211.    Rather than disclose critical safety and health information regarding its AFFF and fluorochemical products, Defendants have consistently and falsely represented the safety of AFFF products.

212.    This fraudulent concealment continues to the present day.

213.    Wherefore, due to Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein through the relevant time for this action, all applicable statutes of limitations have also been tolled.

## Estoppel

214.    Defendants were under a continuous duty to consumers, end users, and other persons, such as Plaintiffs, coming into contact with their fluorochemical products, to provide truthful and reliable safety information concerning their products and the risks associated with their use, as well as exposure to AFFF.

215.    Rather than fulfill this duty, Defendants knowingly, affirmatively, and actively concealed important safety information and warnings concerning AFFF and the health risks associated with the same.

216.    Wherefore, Defendants are estopped from relying on any statute of limitations in defense of this action.

## PUNITIVE DAMAGES

217.    Plaintiffs reallege and reaffirm all allegations as set forth in the preceding paragraphs of this Complaint as if fully restated in this cause of action.

218.    At all times relevant, Defendants had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result, and despite that knowledge, willfully, wantonly, and recklessly pursued their course of conduct.

219.    Defendants' conduct was so gross and flagrant as to show a reckless disregard or a conscious wanton, reckless indifference to consequences or a grossly careless disregard for the life, safety, property, or rights of the Plaintiffs, and the Defendants actively and knowingly participated in such conduct, and/or their officers, directors, or managers knowingly condoned, ratified or consented to such conduct.

220.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to prevent exposure to PFAS, thereby harming Plaintiffs, which warrants the imposition of punitive damages.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for judgment against Defendants, jointly and severally, as follows:

a.    Compensatory damages and all other special damages according to proof including, but not limited to past and future medical and treatment costs; non-economic damages; loss of earnings and future earnings; and household expenses, among others.

b.    Avoiding the transfer of DuPont's liabilities for claims brought in this Complaint;

c.    Exemplary and Punitive damages;

d.    Attorneys' fees;

e.    Pre-judgment and post-judgment interest; and

f.      Any other and further relief as the Court deems just, proper, and equitable.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury of any and all issues properly triable by jury in this

action.

Dated:    July 25, 2025

Respectfully submitted,

<u>*/s/ Steven T. Baron*</u>
**BARON & BUDD, P.C.**
Steven T. Baron (GA Bar No. 106843)
sbaron@baronbudd.com
Holly Werkema (TX Bar No. 24081202)
*(Pro Hac Vice Forthcoming)*
hwerkema@baronbudd.com
3102 Oak Lawn Ave., Ste. 1100
Dallas, Texas 75219
Telephone: (214) 521-3605
Fax: (214) 279-9915

**COSSICH, SUMICH, PARSIOLA**
**& TAYLOR, LLC**
Philip F. Cossich, Jr. (LA Bar No. 1788)
pcossich@cossichlaw.com
Christina M. Cossich (LA Bar No. 32407)
ccossich@cossichlaw.com
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000

***Attorneys for Plaintiff***